1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5  HAROL LAM JORDAN,                    )   No. C 06-3626 SBA (PR)
                                        )
6                    Petitioner,        )   **ORDER DENYING PETITION FOR**
                                        )   **WRIT OF HABEAS CORPUS**
7          v.                           )
                                        )
8  JIMMY WALKER, Warden,                )
                                        )
9                    Respondent.        )
   _____  )

10

11                         **INTRODUCTION**

12          This matter is now before the Court for consideration of Petitioner's <u>pro se</u> petition for a writ

13  of habeas corpus under 28 U.S.C. § 2254 challenging a conviction he received in Alameda County

14  Superior Court.  Respondent Jimmy Walker, Warden of the California State Prison – Sacramento,

15  opposes the petition.  Petitioner has filed a traverse.  For the reasons discussed below, the petition is

16  DENIED as to all claims.

17                          **BACKGROUND**

18  **I.     Case History**

19          On November 17, 2003, a jury found Petitioner guilty of four counts of robbery and one

20  count of attempted robbery (Cal. Pen. Code §§ 211, 664).   The jury also found true allegations that

21  Petitioner personally used a deadly weapon (Cal. Pen. Code § 12022(b)(1)), and Petitioner admitted

22  that he suffered four prior strike convictions (Cal. Pen. Code §§ 667, 1170.12).  The trial court

23  sentenced Petitioner to a term of 135 years to life in state prison.  (Resp't Ex. A at 383.)

24          The California Court of Appeal affirmed the judgment in an unpublished opinion dated July

25  27, 2005, and the California Supreme Court summarily denied a petition for review on November 2,

26  2005.  (Resp't Exs. E, G.)

27          Petitioner filed the instant petition on June 8, 2006, setting forth eleven claims: (1) he was

28  deprived of his constitutional rights when the trial court denied his motion for a new trial based on

newly-discovered evidence (i.e., a confession by his brother to the charged crimes); (2) the trial court violated his constitutional rights by excluding evidence of a voice identification; (3) the trial court violated his constitutional rights by denying his motion for a continuance to allow him to obtain additional evidence; (4) the trial court violated his constitutional rights by excluding a video-taped statement he made to the police; (5) he was deprived of his constitutional right to counsel because he did not have counsel present at a post-charging video lineup; (6) the use of CALJIC No. 2.21.2 violated his right to due process; (7) improper remarks by the prosecutor during closing argument violated Petitioner's right to due process; (8) the trial court violated his right to due process in failing to rule on a defense motion to exclude evidence of a photographic lineup, and in failing to rule on the portion of his new trial motion arguing that the trial court interrupted defense counsel's closing argument; (9) the cumulative effect of the foregoing errors violated his right to due process; (10) the imposition of consecutive sentences violated his constitutional rights; and (11) the trial court's failure to strike one of his prior "strike" convictions violated his right to due process.

On December 21, 2006, Respondent was ordered to show cause.  Respondent filed an answer and memorandum of points and authorities on March 20, 2007, and lodged a number of exhibits. Petitioner filed a traverse on July 26, 2007.  On April 7, 2008, the case was reassigned to the undersigned United States District Judge.  The case was stayed on September 30, 2008, and the stay was lifted on March 17, 2010.  Although Petitioner was given an opportunity to amend the petition after the stay was lifted, he indicated that he did not want to do so.

## II.    Statement of Facts

The following facts are taken from the opinion of the California Court of Appeal:

> The four robberies and one attempted robbery were committed in January and early February 2003.[1]  The two Berkeley gas stations that were robbed were the Arco station at the corner of 6th Street and University Avenue, and the Berkeley Oil station at the corner of 8th Street and University.

> During January and February, the timeframe of the robberies, Lam Jordan, defendant's mother, lived in Berkeley at 2105 7th Street. We take judicial notice that

---

[1]For the sake of simplicity, we will heretofore refer to the four robberies and one attempted robbery as "the robberies."  Until we indicate otherwise, all dates in the ensuing factual recitation are in 2003.

2105 7th Street is just over a block south of the intersection of 7th Street and University Avenue, just south of the intersection of 7th and Addison, and is thus just over two blocks from each victimized gas station.

Defendant lived with Ms. Jordan at 2105 7th Street during January and February. His brother Peter did not. In Ms. Jordan's words, Peter would come "just in and out" or "back and forth." The defense theory was that Peter, who resembled defendant, committed the robberies.

**The Offenses**

**1.     January 8-Berkeley Oil Station, 8th and University**

Lydia Araica was on duty as the cashier in the convenience store inside the Berkeley Oil station. Between 6:20 and 6:30 a.m., a man wearing black clothing, gloves, and a ski mask entered the store, brandished a knife, and said, "Give me the money." The knife was a kitchen knife, with a blade about 8 to 10 inches long, wide in the back and with a pointed tip. The ski mask had three holes, two for the eyes and one for the mouth.

Araica gave the man the money in the cash register, about $160. She could not tell the race of the robber. The robber left, heading away from University towards 8th Street. The robbery was caught on videotape by the store's security camera, but the tape was "very blurry."

**2.     January 14-Arco Station, 6th and University**

Mohamed Ali was on duty as the cashier in the convenience store inside the Arco station. At about 7:00 p.m., a man wearing a blue jacket and black ski mask walked into the store, pointed a knife at Ali, and demanded money and Newport cigarettes. Ali gave the robber over $300 and two cartons of Newports. The robber ran up University to 7th Street and turned into the Ramada Hotel on the opposite side of the street from the Arco station. The robbery was caught on videotape by the store's security camera.

Aimee Rowland, a telecommunications manager, pulled into the Arco station to get gas around 7:00 p.m. It was after dark but the station was very well lit. As she waited for an open gas pump she saw a black man in a blue windbreaker walk out of the convenience store. The man "looked very suspicious on a couple of fronts." He was carrying two cartons of cigarettes, one under each arm, instead of in a bag-which one would normally get when purchasing two cartons. He "kept looking to the right and to the left and to the right as he was coming out."

Rowland, who had worked in clubs as a bouncer, took note of the man's physical appearance because he was acting suspiciously.  He removed the hood of his jacket, and she had no difficulty seeing his face.[2]  She watched him for 45 seconds to a minute before he walked away.  She "got a really nice long look at [his] profile as he was going away, and at one point he did turn around and actually looked dead at me, so I got a good look at his face."

**3.     January 17-Berkeley Oil Station, 8th and University**

---

[2]The robber apparently removed his mask before Rowland saw him leaving the store.

Luis Reyes was working as a cashier in the convenience store at about 5:35 p.m..  A man wearing a white jacket and a black mask walked in and said, "Give me the money" or "Hand over the money."  The man threatened Reyes with a kitchen knife.  Reyes stepped back and grabbed a baseball bat.  Reyes swung the bat at the robber two or three times.  The man "left running ... without the money."  He ran toward 8th and Addison.  Reyes could tell from the hand holding the knife that the robber was black.[3]

The robbery was caught on videotape by the store's security camera.

### 4.    January 21-Arco Station, 6th and University

Mohamed Ali was again on duty as the cashier in the convenience store inside the Arco station. "The same guy" who committed the January 14 robbery again came into the store, this time about 6:46 p.m. He had "the same ski mask, the same knife, the body build, everything." He was wearing a white sweatshirt with a hood. He told Ali, "Give me the money, change, all of it," and also demanded Newport cigarettes. Ali gave him money, less than $300. This second Arco robbery was also caught on videotape by the store's security camera.

On January 31, 2003, Ali saw the robber walking near 9th and Alston. We take judicial notice that Alston is parallel to, and two blocks from, University Avenue. Ali was sure the man was "the same guy that robbed me." The man was wearing the same white hooded sweatshirt he wore on January 21, and had "the same body build, the same shape, the way he walked, I mean everything." Ali did not see the robber's face, but only saw him from the back and side. Ali, who was driving, followed the robber for a few blocks. The robber "disappeared" on the corner of 7th and Addison.

### 5.    February 4-Berkeley Oil Station, 8th and University

Gloria Hernandez was working as a cashier at the station's convenience store at 5:48 p.m., when a man came in, stood at the counter, pointed a kitchen knife at her, and told her to open the cash register. The man was black and wore black clothes, black gloves and a black mask. He held the knife 8 to 10 inches from her stomach and twice said, "Give me the money." Abruptly, the man came around the counter and "cornered" Hernandez against the fax machine. He again demanded that she open the register, and held the knife six inches from her stomach. He sounded desperate and angry. Hernandez opened the register. The man scooped up about $200, and left, heading toward 9th Street.

**The Search of Defendant's Home**

As noted, in January and February defendant was staying with his mother, Lam Jordan, at 2105 7th Street. The house was being refurbished, so defendant slept on a mattress in the kitchen. He kept some of his clothing in the kitchen and some in the garage. Ms. Jordan testified she had only seen Peter a few times in the two-week period before February 7, once on January 21 and "once or twice" after that.

On February 7, Ms. Jordan called the police because defendant was unemployed in January and February, stayed home all the time and didn't listen to her. She complained he also constantly asked for money, stayed out late, and stole her

---

[3]Reyes testified the robber wore gloves but the fingers of the gloves were cut off.

television. She was concerned he was using drugs and would "find something to steal and sell."

Police came to the house and detained defendant. Officers searched the house with Ms. Jordan's consent. In a credenza next to defendant's mattress in the kitchen, the officers found a ski mask, black gloves, and defendant's Social Security card. They found a knife in the kitchen sink. They found a pack of Newport cigarettes in the garage. According to Ms. Jordan, defendant smokes Newports and the pack in the garage was his. She told police the ski mask was defendant's and she had seen him wearing it. She also told police she had not seen Peter at the house in two to three weeks.

**Physical Evidence**

Araica identified the knife seized from defendant's home as different from the one the robber used but similar and of about the same length. She also identified the ski mask seized from defendant's home as similar to one worn by the robber.

Ali looked at a photograph of the knife seized from defendant's home, and said "it looks like" the one used by the robber: "It's almost the knife." He testified the ski mask and gloves seized from defendant's home resembled the ones used by the robber.

Reyes identified the mask and gloves as "look[ing] like the ones that I saw." He also said the knife seized from defendant's home "look like the one that was pointed at me."

Hernandez identified the knife and the mask seized from defendant's home as the same knife and mask used in the robbery.

**Eyewitness Identification Evidence**

Araica selected defendant from a physical line-up on February 10, 2003, in which each man put on a mask and said, "Give me the money." She was not sure defendant was the robber, but thought he might be because "his height and build were very similar to the person who had come to the store and robbed me that day." She could not be sure because the robber was masked and she could not see his face.

Ali admitted he could not see the robber's face because of the ski mask, but he could determine the size and shape of the robber's head and face. Ali also selected a man from the February 10 physical line-up. He was "positive" and "90 percent sure" the person he selected was the person who robbed him on January 14th and January 21st, because "he has the same shape, body build, the movement, the voice, everything."[4]

In court, Ali testified on direct examination that he was not sure the person he selected in the lineup was defendant, in part because in court defendant "looks different, he [has] eyeglasses [and is wearing a] suit." He identified defendant in court as being "similar" to the man he selected from the lineup. But on cross-examination, Ali agreed with defense counsel that he was "a hundred percent sure" that defendant was the person who robbed him. And on re-direct Ali positively identified defendant

---

[4]Ali thought there was a 10 percent chance another man in the lineup was the robber.

as the man who robbed him on January 14th and January 21st.[5]  In addition, Ali viewed a picture of defendant and his brother Peter, and identified defendant in the picture as the man who robbed him.

Rowland positively identified defendant in court as the man she saw walking out of the Arco station store on January 14. She also selected defendant from the videotape of the physical lineup, in part because of his unusual gait, his profile, and the leanness of his face. She was not hesitant with her identification, testifying "I saw the defendant.... I saw the person. He's sitting right there and he was on the lineup."

Rowland also saw a picture of defendant and Peter and identified defendant as the robber. In addition, she saw Peter in the courthouse hallway while waiting to testify, and testified he was not the robber.

Neither Reyes nor Hernandez could identify defendant. It appears Reyes picked a man other than defendant from the February 10 lineup. In court, Hernandez was not sure whether defendant was the man who robbed her.

**Defendant's Jailhouse Telephone Calls**

The People played for the jury several tape recordings of telephone calls defendant made from Santa Rita between his arrest and trial. The recordings suggest that defendant was trying to fabricate an alibi and convince Ms. Jordan to persuade Peter to confess to the robberies.

On May 22, 2003, defendant called his friend Shannon Brown. He told Brown, "I didn't do nothing it was [P]eter" and "Peter did all that shit." Defendant repeatedly insisted to Brown that the two friends were "kicking it" on January 14 by drinking beers and watching the movie "Scarface" because defendant's girlfriend had kicked him out. But Brown wasn't so sure.

Defendant then explained: "My lawyer says I can beat three of them ... [¶] ... [b]ut "the only one that's holding me back is the one on the 14th [.]" Defendant said, "if I could find a witness, you know what I'm saying ... [¶] ... [the lawyer] said I, I come home." Brown then agreed to call defendant's lawyer "to talk to him and see what we can work out." Defendant replied, "Man, tell him ... you remember what happened on the 14th, ... [¶] ... you picked me up around 6:00 o'clock ... [¶] ... [a]nd we went to your house, you know what I'm saying because my girl had kicked me out and we was watching Scarface and then you dropped me off around ... 9:00 o'clock, 9:30, at my mama's house....[¶] ... That's what happened blood. We was drinking all night."

Brown agreed. Defendant asked him if he was "writin' this shit down" and Brown replied, "Yeah."

On September 1, 2003, defendant called his friend Ronnie Johnson. He told Johnson he was going to have his lawyer talk to him. Defendant then pressured Johnson into agreeing he was "in the town" on January 21, and "you and me kicked it." Johnson seemed unsure he was with defendant on that date, and said he had to look at his calendar. Defendant told Johnson he was "going to give you his [presumably, his lawyer's] number.... And ... I'm going to have him talk to you."

---

[5]The direct examination occurred on a different day than the cross and re-direct, when Ali was certain of his identification of defendant. When Ali testified on direct that he was unsure the robber was defendant, Ali was afraid of retribution from defendant and his family.

1    Johnson agreed. Defendant then said, "So just get down like that." Johnson replied,
2    "Yeah. That's cool."

3        Johnson then called Peter so defendant could talk to him in a three-way
     conversation. Defendant told Peter to talk to his lawyer "[s]o I can come home."
4    Defendant referred to "the story" about defendant, Peter and Ms. Jordan being "at the
     house"-inferentially, at the time of one of the robberies. Defendant urged Peter to
5    "work with" him and with his lawyer to "get me up out of here."

6        On August 14, 2003, defendant called Ms. Jordan. Defendant urged Ms.
     Jordan to visit him so he could talk to her about something he couldn't talk about on
7    the phone: "where I can talk to you so we don't have to play riddle with the words."

8        Defendant called Ms. Jordan again on September 19. He told her he was doing
     "[n]ot too good" because "they talking stupid in court."[6] Defendant said, "[M]aybe
9    Peter will have to do something."

10       Defendant told his mother "[t]hey want to blame somebody." He said that
     with his record "they want to keep me forever," but someone with little or no record
11   might get probation, a drug program, or only a two- or three-year sentence. Defendant
     urged Ms. Jordan to "[m]aybe talk to the other person, let him know, man. Serious."
12   Later, defendant said, "You know, me forever, and somebody, you know, like maybe
     do two-three years." Ms. Jordan told defendant to "[t]alk to Peter." Defendant urged
13   Ms. Jordan to talk to him because he wasn't able to call him. The conversation is a bit
     cryptic, perhaps by design, as is a subsequent call on September 25 during which Ms.
14   Jordan reported that "he" would "do the two"-after which defendant complained he
     could not do a lot of prison time and asked Ms. Jordan to understand "that it's not
15   because I hate him."

16   **Testimony of Peter Jordan**

17       Defendant's brother Peter testified as a witness for the People. Peter had
     spoken with defendant by phone "maybe three times" after defendant's arrest.
18   Defendant had asked Peter to take responsibility for the robberies; Peter would "get
     probation or something" and defendant "wouldn't get charged." Defendant asked
19   Peter to take the blame because defendant would be given a longer sentence than
     Peter if he were convicted.
20

21       Peter did not come forward and take responsibility for the robberies
     "[b]ecause I didn't do it." He had avoided the prosecution's attempt to find him to
22   testify "because I've been accused of doing something I didn't do." He testified that
     defendant had used his name "uncountable times" in the past, usually "when he gets
23   in trouble." He denied asking defendant to "take the rap" for him.

24       Peter was shown the videotape of the January 21 robbery. He denied he was
     the robber shown on the tape, and denied owning a white hooded sweatshirt like the
25   one the robber wore. He denied the voice of the robber on the videotape was his
     voice. He denied committing the January 8, January 14, January 17, and February 4
26   robberies.

27       Peter also denied ever seeing the ski mask before, and insisted he never wore
     it. The blue windbreaker worn by the robber in the January 14th robbery did not
28   belong to him. He identified the knife seized from defendant's home as belonging to

     ───────────────────

     [6]Defendant had court appearances September 12 and September 18.

1    Ms. Jordan.

2        Peter testified he mostly stayed "away from [Ms. Jordan's] house" in January
     and February, because he didn't like defendant's "drug habits." Defendant used
3    marijuana and cocaine. Peter admitted that, like defendant, he smoked Newports. He
     also admitted on cross-examination that he had been at Ms. Jordan's home two or
4    three days a week in January-but kept "very little" clothes there.

5        Peter testified his relationship with defendant was strained, but not to the
     point where he would lie in court, or do anything else, to get him convicted. He also
6    testified that in the lobby of the courthouse the day he began his testimony, his
     mother tried to blame him for the robbery in front of the prosecutor and an
7    investigator, and that made him feel "bad."

8        The jury was asked to observe Peter's gait as he left the witness stand and
     walked out of the courtroom.
9

10   **The Defense Case**

11       Despite being a witness for the People, Ms. Jordan tried to implicate Peter to
     exonerate defendant. She testified that Peter came to her home between 6:30 and 7:00
12   p.m. on January 21-the night of the second Arco station robbery. Peter came in very
     quickly, went to his room, and shut the door. He was wearing a grey sweatshirt with a
13   hood. She saw Peter open a carton of cigarettes. Peter handed her $20.[7]

14       On cross-examination, Ms. Jordan claimed defendant had told her that he
     would take the blame for the robberies to protect Peter, because Peter would have
15   trouble adjusting to living in a custodial environment.

16       Defendant testified. He denied committing the robberies. He claimed Peter
     had admitted committing them.
17

18       Defendant testified to a version of the events of January 21 consistent with
     that of his mother's, implicating Peter. Defendant said he had been living with his
19   girlfriend, Tina, until January 21 or 22. On January 21, he had a fight with Tina and
     went to Ms. Jordan's house to spend the day. That evening Tina came over to the
20   house, and they had an argument. While they sat in the car arguing, they saw Peter
     leave the house in a white sweatshirt with a hood. Peter walked down 7th toward
21   University.

22       Peter came home a short while later and ran into the house. Ms. Jordan told
     defendant to find out what Peter had done. Defendant went to Peter's room and saw
23   the knife and ski mask, two cartons of Newports, and cash. Peter gave him $30 or

24

25

26   ─────────────────

27       [7]Peter denied his mother's courtroom assertion that he had robbed the Arco station on
     January 21. He initially did not remember whether he was at Ms. Jordan's home on January 21, as
28   she testified, but then recalled that he was-but could not recall the time. He denied coming to his
     mother's home on the 21st with a carton of cigarettes, going into his room, and giving his mother
     $20. He denied ever coming to the home with a cigarette box full of money and with change. He was
     disturbed by his mother's attempt to blame him for the crime.

1   $40, and told defendant he had just robbed the gas station at 7th and University.[8]

2      According to defendant, Peter was a heroin addict. Peter was supposed to
3   overcome his addiction while defendant was in jail, and turn himself in. Asked about
    the recorded conversations in which he attempted to build alibis around Brown and
4   Johnson for the 14th and 21st, defendant said he was protecting Peter.

5      Four friends of defendant-Shannon Brown, Ronny Johnson, Lamar Nails, and
    Alexander Miller-testified that Peter used heroin and cocaine. Johnson testified, as
6   did Ms. Jordan, that Peter smoked Newports. Johnson and Miller testified that the
    blue windbreaker worn by the January 14 robber belonged to Peter, and in fact was
7   his favorite jacket.[9]  Johnson also identified the hooded sweatshirt worn by the
    January 21st robber as belonging to Peter.

8   People v. Jordan, No. A107006, slip op. at 2-11 (Cal. Ct. App. April 4, 2006) (Resp't Ex. E)

9   (footnotes in original).

10  **DISCUSSION**

11  **I.**  **Legal Standard**

12    **A.**  **Standard of Review for State Court Decisions**

13    Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may

14  grant a petition challenging a state conviction or sentence on the basis of a claim that was

15  "adjudicated on the merits" in state court only if the state court's adjudication of the claim:

16  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

17  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

18  a decision that was based on an unreasonable determination of the facts in light of the evidence

19  presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a

20  petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the

21  petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim

22  advanced, rather than denying the claim on the basis of a procedural or other rule precluding state

23  court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a

24  federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price

26  _____

27    [8]Tina refuted defendant's version of events. She testified that she and defendant broke up
    before New Year's Eve 2002; she saw him only once in January, and that was in the morning; and
28  she never saw defendant on any evening in January. Three weeks before trial defendant called Tina
    and offered her money to testify on his behalf.

  [9]Defendant also testified the blue windbreaker was Peter's favorite jacket.

1    v. Vincent, 538 U.S. 634, 638-43 (2003).

2                      **1.      Section 2254(d)(1)**

3         Challenges to purely legal questions resolved by a state court are reviewed under

4    § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim

5    adjudicated on the merits in state court only if the state court adjudication resulted in a decision that

6    was "contrary to" or "involved an unreasonable application of  clearly established Federal law, as

7    determined by the Supreme Court of the United States."  Williams (Terry) v. Taylor, 529 U.S. 362,

8    402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have

9    independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a

10   petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th

11   Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

12                      **a.      Clearly Established Federal Law**

13        "Clearly established federal law, as determined by the Supreme Court of the United States"

14   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

15   the relevant state-court decision."  Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the

16   source of clearly established law to [the Supreme] Court's jurisprudence."  Id.  "A federal court may

17   not overrule a state court for simply holding a view different from its own, when the precedent from

18   [the Supreme] Court is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is

19   no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the

20   state court's decision cannot be contrary to, or an unreasonable application of, clearly-established

21   federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

22        The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

23   constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the

24   rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are,

25   however, areas in which the Supreme Court has not established a clear or consistent path for courts

26   to follow in determining whether a particular event violates a constitutional right; in such an area, it

27   may be that only the general principle can be regarded as "clearly established."  Andrade, 538 U.S.

28   at 64-65.  When only the general principle is clearly established, it is the only law amenable to the

                                      10

1  "contrary to" or "unreasonable application of" framework.  See id. at 73.

2  Circuit decisions may still be relevant as persuasive authority to determine whether a

3  particular state court holding is an "unreasonable application" of Supreme Court precedent or to

4  assess what law is "clearly established."  Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert.

5  denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

6                    **b.    "Contrary to"**

7  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

8  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

9  state court decides a case differently than [the Supreme] Court has on a set of materially

10  indistinguishable facts."  Williams, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that

11  correctly identifies the controlling Supreme Court framework and applies it to the facts of a

12  prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Williams, 529

13  U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of

14  § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

15                    **c.    "Unreasonable Application"**

16  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

17  state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

18  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 412-13.

19  "[A] federal habeas court may not issue the writ simply because that court concludes in its

20  independent judgment that the relevant state-court decision applied clearly established federal law

21  erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; accord

22  Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application

23  of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v.

24  Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

25  "incorrect" application of law).

26  Evaluating whether a rule application was unreasonable requires considering the relevant

27  rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

28  more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664

11

(2004).  Whether the state court's decision was unreasonable must be assessed in light of the record

that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at 75-

76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging

the overruling of Van Tran on this point).  After Andrade,

> [t]he writ may not issue simply because, in our determination, a state court's
> application of federal law was erroneous, clearly or otherwise.  While the
> "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes
> a greater degree of deference to the state courts than [the Ninth Circuit] ha[s]
> previously afforded them.

Id.  In examining whether the state court decision was unreasonable, the inquiry may require

analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th

Cir. 2003).

### 2.    Sections 2254(d)(2), 2254(e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim

"resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable

determination of the facts occurs where a state court fails to consider and weigh highly probative,

relevant evidence, central to a petitioner's claim, that was properly presented and made part of the

state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must

presume correct any determination of a factual issue made by a state court unless a petitioner rebuts

the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or

situations in which the petitioner challenges a state court's fact-findings based entirely on the state

court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence

presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir.

2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and

2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-

finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The

intrinsic review requires federal courts to examine the state court's fact-finding process, not its

findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.2d at 1000.

        When there is no reasoned opinion from the highest state court to consider the Petitioner's claims, the Court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's first four claims.  There is no explained state court opinion on Petitioner's remaining two claims, which were raised in his state habeas petitions that were summarily denied

**II.      Exhaustion**

        Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b),(c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  The parties do not dispute that Petitioner has exhausted his claims.

**III.     Legal Claims**

        Petitioner claims that: (1) he was deprived of his constitutional rights when the trial court denied his motion for a new trial based on newly-discovered evidence (ie. a confession by his brother to the charged crimes); (2) the trial court violated his constitutional rights by excluding evidence of a voice identification; (3) the trial court violated his constitutional rights by denying his motion for a continuance to allow him to obtain more evidence; (4) the trial court violated his

constitutional rights by excluding a video-taped statement he made to the police; (5) he was deprived

of his constitutional right to counsel because he did not have counsel present at a post-charging

video lineup; (6) the use of CALJIC No. 2.21.2 violated his right to due process; (7) improper

remarks by the prosecutor during closing argument violated Petitioner's right to due process; (8) the

trial court violated his right to due process in failing to rule on a defense motion to exclude evidence

of a photographic lineup, and in failing to rule on the portion of his new trial motion arguing that the

trial court interrupted defense counsel's closing argument; (9) the cumulative effect of the foregoing

errors violated his right to due process; (10) the imposition of consecutive sentences violated his

constitutional rights; and (11) the trial court's failure to strike one of his prior "strike" convictions

violated his right to due process.

### 1.    New Trial Motion

Petitioner claims that he was deprived of his constitutional rights when the trial court denied

his motion for a new trial, which was based upon newly-discovered evidence that purportedly

establishes his innocence, i.e. his brother's confession to the charged crimes.  The California Court

of Appeal summarized the relevant trial court proceedings and background to this claim, as follows:

> Defendant's motion for a new trial was based on the same claim, which he
> urged at trial, that Peter committed the robberies.  But at the time of the new trial
> motion that claim was supported by Peter's recent posttrial confession.
>
> In support of his motion, defendant presented a declaration of his initial trial
> counsel, Assistant Public Defender William Locke, who represented defendant from
> February to April 2003. Locke "recall[ed] having a number of lengthy discussions
> with [defendant], both in court and at Santa Rita Jail" about the robbery charges for
> which defendant had been arrested. Locke "recall [ed] that [defendant] told me
> throughout the entire time I represented him that it was not he but his brother who
> was responsible for the robberies with which he was charged." Locke further recalled
> that he and defendant "discussed various expedients to try to establish this," including
> a photographic line-up including Peter's picture.
>
> Locke attached to his declaration a copy of the notes of defendant's February
> 13, 2003, initial interview with the Public Defender's Office. The notes indicate
> defendant stated several times that his brother Peter committed the robberies.
>
> Defendant also supported his motion with a three-page typewritten declaration
> of Peter Jordan, dated April 6, 2004-roughly five months after defendant was
> convicted. In rote language, Peter states in his declaration that he committed the five
> robberies using a knife and wearing a ski mask, demanding or taking money, and that
> he acted alone with no aid or assistance from defendant. Peter signed the declaration
> under penalty of perjury.
>
> The People opposed the motion, noting that "Defendant was convicted based

upon credible eyewitness identification, circumstantial evidence such as a ski mask in the defendant's possession at the time of his arrest, and impeachment of his various attempts to fabricate conflicting defenses." The People also noted that Peter testified at trial and denied committing the robberies, and told the jury defendant and Ms. Jordan pressured him to admit to the robberies because he would receive a much lighter sentence than defendant.

At the hearing on the new trial motion, Peter appeared and took the stand as a defense witness. He admitted submitting the declaration, but invoked the Fifth Amendment to a series of questions about the robberies. He finished his testimony by stating he would invoke the Fifth Amendment to "any question other than [what is] your name?"

Defendant then presented an audiotape of an interview with Peter in defense counsel's office, with counsel and a defense investigator present. The interview took place January 29, 2004. Peter admitted committing the five robberies, acting alone. He was recanting his trial testimony "[b]ecause I feel that it was wrong to let my brother be[ ] wrongfully convicted of these robberies when he didn't do them and I did." He did not initially admit the robberies because he was afraid of going to jail. He was not admitting the robberies just to spare defendant, who already had three strikes, from doing substantial prison time.

Peter also admitted he had spoken to a District Attorney investigator a few days before the defense-counsel interview-but had told the investigator he did not commit the robberies. The investigator testified at the new trial motion as a witness for the People, and stated that he had interviewed Peter on January 23, 2004. Peter denied committing the robberies and said he testified truthfully at trial. Peter told the investigator that his mother, Ms. Jordan, had pressured him to take responsibility for the robberies. So did defendant's friends. On the day Peter testified at trial, the investigator told Peter in front of his mother that his mother was blaming him for the crimes. Peter appeared "stress[ed], tearful, was upset."

The trial court denied the new trial motion: "[Defense counsel] is urging that I grant a new trial motion under [section] 1181, [subdivision] 8, which reads as follows: 'When new evidence is discovered material to the defendant ... which he could not, with reasonable diligence, have discovered [and produced] at [the] trial.' I would submit and rule that the new evidence proffered by [defense counsel] would not be admissible evidence, namely, [Peter's] assertion of his Fifth Amendment rights would not be evidence that could be presented at a new trial, that his out-of-court affidavits one of which is an affidavit, the other is a statement on tape, would not be admissible at trial under the rule that the witness is not available for cross-examination, and even if they were admissible at trial they would be directly impeached by his sworn testimony at trial *which I did find credible that he did not participate in these robberies*." (Italics added.)

(Resp't Ex. E at 12-14.)

Petitioner claims that the denial of the new trial motion, in which he sought to present newly-discovered evidence, violated his constitutional rights to due process and to present a complete defense. Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina,

15

547 U.S. 319, 324 (2006) (quoting <u>Crane v. Kentucky</u>, 476 U.S. 683 690 (1986)).  At his trial,

Petitioner was allowed to present his defense that it was his brother who committed the crimes.  He

was also allowed to seek a new trial based upon his brother's confession after trial.  Petitioner cites

no United States Supreme Court authority, however, and this Court is aware of none, providing that

a defendant has a constitutional right to a new trial in the absence of any error at trial, or that the

right to present a defense includes an unfettered right to a second trial based on newly-discovered

evidence.

   In this case, moreover, the denial of the new trial motion was based on the state courts'

reasonable factual finding that the newly-discovered evidence was not credible.  The trial court

found that Peter's trial testimony in which he denied the crimes was credible, and more credible than

his purported confession after trial.  Such a factual finding is entitled to deference under 28 U.S.C. §

2254(d)(2).  The relevant question under § 2254(d)(2) is whether the state appellate courts, applying

the normal standards of appellate review, could reasonably conclude that the state court findings are

supported by the record.  <u>See</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 978 (9th Cir. 2004).  Here, the

California Court of Appeal upheld the trial court's credibility finding, as follows:

> Defendant's claim that Peter was the robber was not news to the trial court at
> the hearing on the new trial motion. Defendant had contended throughout the trial
> that it was not he but Peter who had committed the robberies. Peter testified and
> denied complicity. The trial court had the opportunity to observe his demeanor. When
> Peter changed his story after his brother was convicted-and faced a substantial
> sentence-the trial court determined that his recent confession was not credible
> because the court found credible his trial testimony to the contrary, that he did not
> commit the robberies.
>
> This is a case where the defendant repeatedly tried to manufacture alibis as
> well as blame his brother. There are indications defendant's mother pressured Peter
> into taking the blame for the robberies defendant committed. Peter's testimony
> denying complicity in the robberies was found credible by the trial court. Peter's
> motive for changing his story is obvious.

(Resp't Ex. E at 15-16.)  There was ample evidence in the record supporting the trial court's

determination that Peter's post-trial confession was not credible.  Peter had denied committing the

crimes at trial, and had testified that Petitioner had tried to pass the blame onto Peter when he got

into trouble in the past.  In addition, Petitioner's telephone calls from jail showed him trying to

create alibis.  Petitioner's mother tried to persuade Peter to take the blame for the crimes.  Peter did

not confess to the crimes until after Petitioner received a substantial sentence.  There was also a host

of eyewitness and other witness testimony identifying Petitioner as the robber and implicating Petitioner in the crimes.  Under these circumstances, the California Court of Appeal reasonably found that the trial court's credibility determination was supported by the record.  See 28 U.S.C. § 2254(d)(2).  The Court is aware of no authority, and Petitioner certainly cites to none, providing that a defendant's right to present a defense includes the right to present newly-discovered evidence that is not credible.

It is further noted that any argument that Peter's post-trial confession establishes Petitioner's innocence does not state a claim for federal habeas relief.  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993).  After Herrera, courts generally have found that there can be no habeas relief based solely on a petitioner's actual innocence of the crime.  See Coley v. Gonzalez, 55 F.3d 1385, 1387 (9th Cir. 1995).

Accordingly, the state courts' decisions denying Petitioner's challenge to the denial of his motion for a new trial were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

### 2.   Exclusion of Voice-Identification Evidence

Petitioner claims that the trial court violated his right to due process by excluding voice-identification evidence.[10]  The trial court excluded lay opinion testimony by four witnesses, including Petitioner's mother, that the voice on surveillance tapes of two of the robberies was Peter's and not Petitioner's.

The exclusion of defense evidence may violate a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted).  In deciding

---

[10]Petitioner also refers to evidence of his myopia in claim 2.  The trial court did not exclude evidence of his myopia, but rather denied his motion for a continuance in order to gather myopia evidence.  Petitioner's challenge to the denial of the continuance is discussed in the next section below, (Section III.3.).

if the exclusion of evidence violates the due process right to a fair trial or the right to present a

defense, the court balances the following five factors: (1) the probative value of the excluded

evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of

fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it

constitutes a major part of the attempted defense.  Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir.

2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  The court must also give due

weight to the state interests underlying the state evidentiary rules on which the exclusion was based.

Chia, 360 F.3d at 1006.

  Here, the California Court of Appeal found that the evidence was properly excluded under

California Rule of Evidence 800, which allows the admission of lay opinion testimony if the opinion

is both "rationally based on the perception of the witness" and "helpful to a clear understanding of

his testimony."  (Resp't Ex. E at 16-17.)  Under this rule, two predicates are required in order to

admit lay opinion testimony as to the identity of a person recorded on a surveillance tape: (1) the

witness must testify from personal knowledge of the defendant's voice at or near the time the tape

was made; and (2) the testimony must aid the trier of fact in deciding the identity issue.  (Id. at 17

(citing California cases).)  The appellate court found that the law opinion evidence was not

admissible because it was not helpful to the jury:

> The trial court excluded the lay opinion testimony for failing to meet the
> second predicate of helpfulness to the jury. This ruling was correct. Lay opinion of
> identification is considered helpful to the jury when the jury is unable to make an
> adequate identification on its own-for instance, when the defendant has changed his
> appearance for trial or the primary evidence of identification, such as a photograph or
> tape, is unclear. (People v. Ingle (1986) 178 Cal.App.3d 505, 513, 223 Cal.Rptr. 723;
> Mixon, supra, 129 Cal.App.3d at ¶. 128-129, 180 Cal.Rptr. 772; Perry, supra, 60
> Cal.App.3d at p. 613, 131 Cal.Rptr. 629.)
>
> Here there is no indication that the audio portion of the surveillance tapes was
> unclear. And, as the trial court noted, there was no issue of defendant changing his
> voice. The exclusion of the lay opinion testimony was proper. We note, as did the
> trial court, that Peter testified and the jury had an opportunity to compare his voice to
> that of the robber on the tapes. Thus, the jury was able to make its own identification,
> and the lay opinion testimony was not "helpful" under the test set forth above.

(Resp't Ex. E at 17.)

  For the reasons cited by the California Court of Appeal in explaining why excluding the lay

opinion testimony did not violate state law, the exclusion of the evidence also did not violate

18

Petitioner's constitutional rights under the <u>Miller</u> factors set forth above.  While the identity of the voices on the tapes related to the central issue of identity, the lay opinions of Petitioner's mother and friends as to the identity of those voices were both cumulative to and less reliable than other evidence presented at trial.  Both Petitioner and Peter testified at trial, and the jury heard the surveillance tapes.  Thus, the jury could compare first-hand both Petitioner's and Peter's voices to those on the tapes.  By contrast, the opinions of the defense witnesses could be called into question by their relationship to the defendant, including Petitioner's mother about whom there was evidence that she had tried to pressure Peter into taking the blame for the crimes.  As the jury could compare the voices on its own, the exclusion of lay opinion testimony on this issue did not render the trial so unfair as to violate Petitioner's right to due process or his right to present a defense.

Accordingly, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254(d)(1),(2).

### 3.   <u>Continuance</u>

Petitioner that the trial court violated his constitutional rights by denying his motion for a continuance so that he could obtain more evidence of his myopia.  At trial, one of Petitioner's theories was that he could not see well enough without glasses to commit the robbery, and the prosecution argued that he could.  The California Court of Appeal summarized the relevant trial court proceedings, including the evidence presented at trial regarding Petitioner's eyesight and whether the perpetrator of the robberies wore glasses, as follows:

> Araica could not remember whether the robber wore eyeglasses. Ali didn't think the robber on January 21 was wearing eyeglasses, but wasn't sure. He didn't know if the robber wore glasses when he spotted him on January 31. Rowland did not remember seeing eyeglasses on the robber's face, or did not notice any glasses. Reyes had seen defendant several times as a customer in the store before the robbery attempt, but he did not remember if defendant wore glasses.

> Peter testified that he did not wear glasses, but that defendant wore glasses "all his life." But a picture of defendant taken the day he was arrested, February 7, shows him not wearing glasses. Peter thought defendant was "farsighted, when you can't see things close to you" because defendant cannot see things "close" without his glasses.

> Ms. Jordan testified defendant always wore his glasses, except while bathing

19

or washing his face.

Defendant testified that he had worn glasses since he was 14, wore them except when showering or sleeping, and needed them to see both distant objects and close ones. But the Department of Motor Vehicles (DMV) issued defendant a driver's license without a corrective lenses restriction. This means that defendant may legally drive without wearing glasses.

Defendant's friend Alexander Miller testified that sometimes defendant did not wear his glasses.

On November 3.2003, the eighth day of trial, the People called DMV employee Jose Flores to establish that defendant's license did not have a corrective lenses restriction. Flores testified near the end of the People's case-in-chief, after all of the eyeglass-related testimony set forth above-except the testimony of defendant and his friend Miller.

On November 5, 2003, the tenth day of trial, defendant moved for a continuance. He argued that on November 3 "the prosecution raised the issue that even though the defendant wore eyeglasses the defendant's glasses were cosmetic in nature and were not necessary to improve his vision. Based upon the testimony of Jose Flores ... the defendant's driver['s] license reflects no restrictions[,] which infers [ sic: "implies"] that the defendant has no visual handicaps."

Defendant represented that he had served a subpoena on For Eyes, which had previously provided defendant with a pair of prescription eyeglasses. For Eyes had faxed defense counsel information including defendant's prescription. Defendant claimed the prescription "shows a serious myopic condition."[11]  Defendant asked for a continuance "to confirm this condition and assure that the jury has correct evidence," and to have defendant "examined by an optometrist to determine the defendant's vision and his ability to see without corrective lens[es]."

At the hearing on the motion for a continuance, the trial court observed that it was defendant who first raised the issue of whether he and the robber wore glasses, but it was the People who "brought in the suggestion that the glasses were not necessary for [defendant] ... [and were] either ... cosmetic or unnecessary." The court ruled that defendant had a right to present evidence that he needed prescription glasses. Defendant refined his request for a continuance, asking for more time to enable an optometrist to come to court to interpret defendant's records from For Eyes. The court denied the request on condition that the parties stipulate that defendant wore prescription glasses.

Fifteen minutes after the denial of the continuance, the People rested. Prior to defendant's testimony, the parties stipulated that For Eyes had filled eyeglass prescriptions for defendant in 1998, 1999, 2001, and 2003. Defendant testified that he needed glasses to see both close and distant objects. But he did not know what his prescription was, only that his vision was poor. The jury asked whether his vision was "20/20, 20/40, 20/50, 20/200?" As a result, defendant's eyeglasses were put into evidence, with the court remarking that it did not "want to have to stop-call an expert in and put in what the prescription is for."

_____

[11]Myopia is defined as "a condition in which the visual images come to a focus in front of the retina of the eye resulting [especially] in defective vision of distant objects." (Webster's 10th New Collegiate Dict. (2001) p. 768, col. 1.) In other words, a myopic person has difficulty seeing faraway objects.

1

2
>        In closing argument, the prosecutor argued defendant did not need glasses for
>        all activities and did not always wear them. Defense counsel countered by arguing
>        that defendant needed glasses to see "any appreciable distance." Counsel also urged
>        the jury to examine defendant's eyeglasses.

3

4
(Resp't Ex. E at 17-18.)

5
To establish a constitutional violation based on the denial of a continuance motion, a

6
petitioner must show that the trial court abused its discretion through an "unreasoning and arbitrary

7
insistence upon expeditiousness in the face of a justifiable request for delay." Houston v. Schomig,

8
533 F.3d 1076, 1079 (9th Cir. 2008) (citation and internal quotation marks omitted).  In addition, the

9
improper denial of a requested continuance warrants habeas relief only if there is a showing of actual

10
prejudice to petitioner's defense resulting from the trial court's refusal to grant a continuance. See

11
Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).

12
A requisite abuse of discretion will be found if, after carefully evaluating all relevant factors,

13
it is concluded that the denial is arbitrary or unreasonable.  See Armant v. Marquez, 772 F.2d 552,

14
556 (9th Cir. 1985).  When considering whether there has been an abuse of discretion, the court

15
looks to four factors: (1) the degree of diligence by the defendant prior to the date beyond which a

16
continuance was sought; (2) whether the continuance would have served a useful purpose if granted;

17
(3) the extent to which granting the continuance would have inconvenienced the court and the

18
opposing party; and (4) the amount of prejudice suffered by the defendant as a result of the court's

19
denial.  See id.

20
Petitioner argues here, as he did in the state trial and appellate courts, that the continuance

21
was necessary in order to present the testimony of an optometrist to clarify the extent of Petitioner's

22
visual impairment and whether or not he needed glasses to commit the crimes.  There was no

23
evidence in the record as to whether Petitioner had diligently attempted to present an optometrist's

24
testimony prior to seeking the continuance.  It does not appear that any attempt was made.  In any

25
event, the jury already received a stipulation that Petitioner needed prescriptions between 1998 and

26
2003, Petitioner and other witnesses had testified to his need for glasses, and the jury even received

27
Petitioner's glasses themselves.  By looking at the glasses, the jury would be able to assess how

28
strong they were and whether Petitioner would need them to rob a gas station at knife point.  Under

these circumstances, the California Court of Appeal reasonably found the denial of the continuance

1   in order to allow Petitioner to obtain the testimony of an optometrist to be neither an abuse of

2   discretion nor prejudicial to Petitioner.

3          Accordingly, the state courts' decisions denying Petitioner's claim of error in the failure to

4   grant a continuance were not contrary to, or an unreasonable application of, clearly established

5   Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light

6   of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

7          **4.      Exclusion of Evidence of Petitioner's Statement to Police**

8          Petitioner claims that the trial court violated his constitutional rights by excluding a

9   videotaped statement he made to the police at the time of his arrest in which he claimed that it was

10  his brother, Peter, who had committed the crimes.  The California Court of Appeal summarized the

11  relevant background to this claim as follows:

12              During his cross-examination of defendant, the prosecutor suggested that
            defendant and his mother had only recently decided to point the finger of blame at
13          Peter. The prosecutor asked defendant if he had ever asked the police to conduct a
            lineup with Peter included. Defendant testified that he asked Detective Stines for such
14          a lineup on the day he was arrested. He went on to testify that he told Stines "that I
            knew who did it the day he interviewed me from the arrest on February 7th."
15
                During his cross-examination of defendant, the prosecutor suggested that
16          Defendant moved to admit the tape recording of his interview with Stines, as a
            prior consistent statement to rebut the allegation of recent fabrication. (Evid.Code, §
17          791.) The trial court denied the motion, ruling that defendant had already testified he
            told police that Peter was the robber. The court noted that there was no transcript of
18          the recording, and that much of defendant's statements on the tape were self-serving
            or otherwise inadmissible.
19
20  (Resp't Ex. E at 22.)

21          As explained above, the exclusion of defense evidence may violate a defendant's

22  constitutional rights to due process and to present a defense, rights originating in the Sixth and

23  Fourteenth Amendments.  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and

24  citations omitted).  The California Court of Appeal found that the trial court properly excluded the

25  video statement under state rules of evidence because the "gist" of Petitioner's statement on the

26  video – that he had both requested a lineup with Peter in it and blamed Peter for the crimes as soon

27  as he was arrested – had already been presented to the jury by Petitioner.  (Resp't Ex. E at 22.)  The

28  videotape statement might have bolstered Petitioner's testimony that as soon as he was arrested he

    had blamed Peter and requested a lineup with Peter in it.  The point was no longer contested by the

prosecutor, however, as soon as Petitioner testified to this effect, obviating any need to bolster Petitioner's credibility on this issue   Further, the videotaped statement showed only that Petitioner had *claimed*, when he was arrested, that Peter had committed the crimes, but it had no bearing on the underlying issue of whether Peter had actually done so.  As the videotaped statement would have added little, if anything, to the trial or to Petitioner's defense, its exclusion did not render the trial fundamentally unfair in violation of due process or violate Petitioner's Sixth Amendment right to present a defense.

Consequently, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

**5.**   **Right to Counsel**

Petitioner claims that he was deprived of his constitutional right to counsel because he did not have counsel at the post-charging video lineup.  Prior to charging Petitioner, the police conducted a live lineup, which they videotaped.  (Reporter's Transcript ("RT") (Resp't Ex.) at 16, 18.)  After charging Petitioner, the police showed the videotape lineup to one of the eyewitnesses, Aimee Rowland.  (RT at 401.)  The California Court of Appeal rejected Petitioner's claim because the right to counsel does not include the right to have counsel present at a videotape lineup.  (Resp't Ex. E at 23 (citing California case law).)

The Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him."  Kirby v. Illinois, 406 U.S. 682, 688 (1972).  Adversary judicial proceedings are initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment.  See United States v. Gouveia, 467 U.S. 180, 188 (1984).  Once the right to counsel attaches, counsel must be present at all "critical stages" of the prosecution, absent an intelligent waiver by the defendant.  United States v. Wade, 388 U.S. 218, 226, 237 (1967); United States v. Hamilton, 391 F.3d 1066, 1070-71 (9th Cir. 2004).  The stages of a prosecution deemed "critical" for Sixth Amendment include post-indictment physical lineups.  Id. at 1070.  It does not include post-charging photographic lineups, however.  United States v. Ash, 413

U.S. 300, 321 (1973) (citing cases).  A videotape lineup is more analogous to a photographic lineup than to a live, physical lineup.  But even if a videotape lineup could somehow be distinguished from a photographic lineup, Petitioner would not be entitled to relief on this claim because there is no "clearly established" Supreme Court precedent – or, for that matter, Ninth Circuit precedent – making such a distinction or requiring the presence of counsel at a video lineup.  In the absence of such authority, Petitioner may not obtain habeas relief on his claim.  See 28 U.S.C. § 2254(d)(1).

Consequently, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

## 6.   CALJIC No. 2.21.2

Petitioner claims that the use of CALJIC No. 2.21.2 violated his right to due process by lowering the prosecution's burden of proving Petitioner's guilt from a standard of "beyond a reasonable doubt" to a standard of "preponderance of the evidence."  The California Court of Appeal denied this claim based on authority from the California Supreme Court rejecting such a challenge to the instruction.  (Resp't Ex. E at 23.)

CALJIC No. 2.21.2, as given to Petitioner's jury, reads as follows:

> A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

(Resp't Ex. A at 309.)

The Ninth Circuit has rejected a similar challenge to CALJIC No. 2.21.2.  See Turner v. Calderon, 281 F.3d 851, 865-66 (9th Cir. 2002).  The Ninth Circuit found the instruction constitutional "because the jury 'remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible.'"  Id. at 866 (quoting Cupp v. Naughten, 414 U.S. 141, 149 (1973)).   This Court is bound by the Ninth Circuit's holding in Turner.

Consequently, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. §

1  2254(d)(1),(2).

2      **7.      Prosecutorial Misconduct**

3      Petitioner claims that the prosecutor committed misconduct and violated Petitioner's right to

4  due process during closing argument by arguing that the jury should not believe defense evidence

5  unless it is corroborated and by impugning the honesty of defense counsel.

6      A defendant's due process rights are violated when a prosecutor's misconduct renders a trial

7  "fundamentally unfair."  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  Under <u>Darden</u>, the first

8  issue is whether the prosecutor's remarks were improper; if so, the next question is whether such

9  conduct infected the trial with unfairness.  <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005).  A

10  prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to

11  determine whether the prosecutor's remarks so infected the trial with unfairness as to make the

12  resulting conviction a denial of due process.'"  <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995)

13  (citation omitted).

14      Factors which a court may take into account in determining whether misconduct rises to a

15  level of due process violation are: (1) whether a curative instruction was issued; (2) the weight of

16  evidence of guilt, <u>see</u> <u>United States v. Young</u>, 470 U.S. 1, 19 (1985); (3) whether the misconduct

17  was isolated or part of an ongoing pattern, <u>see</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987);

18  (4) whether the misconduct relates to a critical part of the case, <u>see</u> <u>Giglio v. United States</u>, 405 U.S.

19  150, 154 (1972); and (5) whether a prosecutor's comment misstates or manipulates the evidence, <u>see</u>

20  <u>Darden</u>, 477 U.S. at 182.

21

22      If the prosecutor made improper remarks that infected the trial with fundamental unfairness,

23  then a due process violation has occurred, but habeas relief is not warranted unless the error caused

24  actual prejudice, meaning it had "a substantial and injurious effect on or influence in determining the

25  jury's verdict."  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993); <u>Bains v. Cambra</u>, 204 F.3d

26  964, 977 (9th Cir. 2000).

27      The California Court of Appeal summarized the portions of the prosecutor's closing

28  argument challenged by Petitioner as follows:

> The prosecutor, John C. Cox, seemed somewhat animated by defense
> counsel's closing argument. Cox announced at the beginning of his rebuttal argument

25

that he was "trying to remain a little bit calm." He then argued, "What has gone on in this case is a mockery of the system. You've seen from start to finish the defense pull all sorts of games and all sorts of tricks." Cox then referred to a few matters on which he claimed defense counsel, Alastair R. McCloskey, had misstated the evidence. He then concluded:

> "I would ask you not to trust anything that comes from the defense unless it is corroborated. What I mean by corroboration is if you look at all the evidence in this case, all the evidence pointing to guilt is corroborated. You have little bits and pieces in different witnesses' testimony which is both internally consistent and externally consistent."

> Cox reminded the jury that defendant had tried to manufacture alibis from jail, but "got caught in it because the phone calls were recorded." He also attacked Ms. Jordan's credibility. Then, returning to the false alibis, the prosecutor argued, "A trial is supposed to be [a] search for the truth. Attorneys are supposed to have an obligation to put on truthful testimony ... [¶] ... People shouldn't be putting on testimony when they know it's not truthful." Noting that McCloskey had claimed in his argument he was not trying to "hoodwink" the jury, Cox argued that McCloskey "absolutely" was trying to hoodwink the jury.

> Finally, Cox compared his own attempts "to get [the jury] as much ... complete information as possible" with McCloskey's alleged misleading of the jury. Referring to defendant's testimony that he could play basketball without his glasses, the prosecutor said, "a few minutes ago Mr. McCloskey [was] telling you [defendant is] blind as a bat. It's disrespectful to you and it's not appropriate for the courtroom."

(Resp't Ex. E at 20-21.)

First, Petitioner argues that the prosecutor's remarks that defense evidence needed corroboration misled the jury as to prosecutor's burden of proof.  The California Court of Appeal rejected this claim because "[t]aken in context, the prosecutor's remark about corroboration was simply an argument that the defense was trying to mislead the jury, and an attempt to focus the jury on the relevant evidence put forward by the People."  (Resp't Ex. E at 21-22.)  In making the comments about corroboration the prosecutor was arguing that the defense evidence, unlike the prosecution evidence, was internally inconsistent.  Viewed in its proper context, therefore, the comments did not change the prosecution's burden of proof.  Moreover, the trial court instructed the jury pursuant to CALJIC No. 2.90, that the prosecutor bore the burden of proving the crimes beyond a reasonable doubt, which would have corrected any confusion the prosecutor's comments might have caused.  See Boyde v. California, 494 U.S. 370, 384-85 (1989) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.").  Under these circumstances, the

26

prosecutor's comments about corroboration did not so "infect" the trial as to render it "fundamentally unfair" of violate Petitioner's right to due process.

Second, Petitioner argues that the prosecutor's comments impugned defense counsel's integrity.  A prosecutor may not attack defense counsel's integrity and veracity, <u>Bruno v. Rushen</u>, 721 F.2d 1193, 1195 (9th Cir. 1983), and such comments may be so prejudicial as to render the trial fundamentally unfair, <u>see</u> <u>United States v. Rodrigues</u>, 159 F.3d 439, 449-51 (9th Cir. 1998), <u>amended</u>, 170 F.3d 881 (9th Cir. 1999).  The California Court of Appeal correctly found the comments to be misconduct insofar as the prosecutor argued that defense counsel had knowingly presented false evidence.  (Resp't Ex. E at 22.)  To gain federal habeas relief, however, <u>Brecht</u> requires that Petitioner shows that the comments had a substantial and injurious effect or influence in determining the jury's verdict.  <u>See</u> <u>Williams v. Borg</u>, 139 F.3d  at 745.  The state appellate court found the misconduct harmless "in light of the more than substantial evidence" against Petitioner. (Resp't Ex. E at 22.)  Two eyewitnesses positively identified Petitioner as the robber, the mask and knife were found next to Petitioner's bed, a similar method was used in each robbery, and there was evidence that Petitioner had attempted to have his friends supply false alibi testimony.  The prosecutor's improper comments in closing argument did not have a substantial and injurious effect or influence in determining the jury's verdict because of the overwhelming evidence that it was Petitioner and not Peter who committed the crimes.  <u>See, e.g.</u>, <u>Williams</u>, 139 F.3d  at 745 (prosecutor's charge that defense counsel intentionally introduced defendant's testimony knowing that defendant would not submit to cross-examination and that testimony would be stricken was not prejudicial under <u>Brecht</u> where evidence of guilt was overwhelming).

Accordingly, the state courts' decisions denying Petitioner's claim of prosecutorial misconduct were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254(d)(1),(2).

### 8.   **Rulings on Defense Motions**

Petitioner claims that the trial court violated his right to due process in failing to rule on a defense motion to exclude evidence of a photographic lineup, and in failing to rule on the portion of

the new trial motion arguing that the trial court interrupted the defense's closing argument.

**A.     Motion to Suppress Photo Identification**

Prior to trial, Petitioner moved to suppress the photographic lineup shown to prosecution witness Mohamed Ali on the grounds that the background behind Petitioner's photo was lighter than the others, making the lineup unduly suggestive.  (RT at 7-8.)  The trial court found the lineup not suggestive, but ruled that it would hole a hearing in limine if the prosecutor used the lineup his direct examination of Ali.  (Id. at 9, 12.)  Later, when the prosecutor asked Ali about the photographic lineup during direct examination, defense counsel did not object and no hearing was held.  (Id. at 258.)

Because Petitioner did not contemporaneously object when the lineup was introduced into evidence at trial, he has procedurally defaulted this claim from a federal habeas corpus review.  A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  The California Court of Appeal held that Petitioner had forfeited his claim by failing to object when the prosecutor introduced the lineup evidence during the direct examination of Ali, citing California's procedural requirement that defense counsel has raise an objection at trial when evidence is introduced in order to challenge the evidence on appeal.  (Resp't Ex. E at 23-24 (citing People v. Obie, 41 Cal.App.3d 744, 750 (1974), disapproved on unrelated grounds People v. Rollo, 20 Cal.3d 109, 120, fn. 4 (1977).).  The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a failure to object at trial.  Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); see Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim of instructional error procedurally defaulted where state court ruled that claim waived by failure to object to the instruction at trial); Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004) (finding claim procedurally defaulted where state supreme court found constitutional claim waived because petitioner failed to raise it below).  Because Petitioner failed to contemporaneously object when the lineup evidence was introduced at trial in accordance with California's contemporaneous objection rule, and the California Court of Appeal

28

ruled that the claim was thereby waived on appeal, his claim that the answer violated his right to due process is procedurally defaulted from federal habeas review.

Even if the claim was not procedurally defaulted, the claim fails on its merits. As noted, the trial court initially found that the lineup was not suggestive, and Petitioner cites no reason that the trial court would have changed its mind a few days later when the lineup was introduced into evidence. Consequently, there is no basis for finding that the trial court's failure to rule on the suggestiveness of the lineup when it was introduced into evidence rendered the trial fundamentally unfair in violation of Petitioner's right to due process.

### B.     New Trial Motion

Petitioner claims that the trial court violated his right to due process by failing to rule on the second argument he made in his new trial motion, namely that the trial court interrupted the defense's closing argument. As noted above, Petitioner argued in his new trial motion that his brother had confessed to the crimes. The motion also claimed that the trial court committed misconduct by interrupting defense counsel's closing argument for a lunch recess. (Resp't Ex. E at 23.) The California Court of Appeal held that the trial court did rule on this argument when it denied the new trial motion in its entirety. (Id.) The record reflects that the trial court denied the new trial motion. (RT at 1206.) The fact that the trial court did not specifically discuss each of Petitioner's arguments in denying the motion does not mean that it did not rule on those arguments. The denial of the new trial motion necessarily implies a rejection of all of the arguments set forth therein.

For these reasons, the state courts' decisions denying Petitioner's claim that his right to due process was violated by the alleged failure of the trial court to rule on two of his motions were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(1),(2).

### 9.     Cumulative Error

Petitioner claims that the cumulative effect of the foregoing asserted trial errors caused his trial to be fundamentally unfair, in violation of his right to due process. Petitioner cites no Supreme

Court precedent, and the Court is aware of none, providing that the cumulative effect of multiple alleged errors may violate a defendant's due process right to a fair trial.  As discussed above, AEDPA mandates that habeas relief may be granted only if the state courts have acted contrary to or have unreasonably applied federal law as determined by the United States Supreme Court.  Williams v. Taylor, 529 U.S. at 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence.").  Consequently, in the absence of Supreme Court precedent recognizing a due process theory of "cumulative error," habeas relief cannot be granted on such a claim.  In any event, there is no cumulative error in this case.  For the reasons discussed above, only one of the errors asserted by Petitioner occurred at trial – that the prosecutor committed misconduct during closing argument, but this error was not prejudicial.  Consequently, there was no accumulation of prejudice from multiple errors in this case.

Accordingly, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

**10.    Consecutive Sentences**

Petitioner claims that that the trial court's decision to run the sentences on his various counts consecutively violated Blakely v. Washington, 542 U.S. 296 (2004), because the decision was made by the judge and not the jury.  In Blakely, the United States Supreme Court held, based on its prior decision in Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000), that any fact that increases the penalty for a crime beyond what a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant must be submitted to a jury and proved beyond a reasonable doubt.  Blakely, 542 U.S. at 303-04.[12]

The application of Apprendi, Blakely, and their progeny is limited to sentencing decisions historically reserved for the jury.  See Oregon v. Ice, 129 S. Ct. 711, 717-18 (2009).  As such, Blakely does not extend to a state's sentencing system that gives judges discretion to determine facts

---

[12]Petitioner alleges a violation of due process, but Blakely concerns a defendant's Sixth Amendment right to a jury, not due process.

30

allowing imposition of consecutive or concurrent sentences for multiple offenses because the determination of consecutive versus concurrent sentences is traditionally not within the function of the jury.  Id.; see also United States v. Dees, 476 F.32d 847, 854 (9th Cir. 2006).  As the rule in Blakely does not apply to the trial court's imposition of consecutive sentences, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

### 11.   Prior "Strike" Conviction

Lastly, Petitioner claims that the trial court's failure to strike one of Petitioner's prior "strike" convictions in imposing the sentence violated Petitioner's right to due process.  Under state law, a trial judge has discretion to dismiss a prior "strike" conviction at sentencing.  People v. Garcia, 20 Cal. 4th 490, 503-04 (1999); People v. Superior Court (Romero), 13 Cal. 4th 497 (1996).

State sentencing courts must be accorded wide latitude in their decisions as to punishment.  See Walker v. Endell, 850 F.2d 470, 476 (9th Cir. 1987).  Generally, therefore, a federal court may not review a state sentence that is within statutory limits.  See id.  A federal court may vacate a state sentence imposed in violation of due process if a state trial judge imposed a sentence in excess of the state's statutory limits, however.  Id.  There is no dispute that Petitioner's sentence in this case was within the statutory limits of California's "Three Strikes" law (Cal. Pen. Code §§ 667, 1170.12).  Whether or not the trial court properly exercised its discretion in failing to dismiss one of Petitioner's strikes is a question of state law that does not provide a basis for federal habeas relief.

Consequently, the state courts' decisions denying Petitioner's sentencing claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

No certificate of appealability is warranted in this case.  See Rule 11(a) of the Rules

1   Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of

2   appealability in same order that denies petition).  Petitioner has failed to make a substantial showing

3   that any of his claims amounted to a denial of his constitutional rights or demonstrate that a

4   reasonable jurist would find this Court's denial of his claims debatable or wrong.  See Slack v.

5   McDaniel, 529 U.S. 473, 484 (2000).

6        IT IS SO ORDERED.

7   DATED: 9/16/10

8                                                        SAUNDRA BROWN ARMSTRONG
                                                         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2    UNITED STATES DISTRICT COURT
     FOR THE
3    NORTHERN DISTRICT OF CALIFORNIA

4

5    JORDAN et al,
                                              Case Number: CV06-03626 SBA
6               Plaintiff,
                                              **CERTIFICATE OF SERVICE**
7        v.

8    WALKER et al,

9               Defendant.
     _____/

10

11   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

12
     That on September 17, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
13   copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
     envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
14   located in the Clerk's office.

15

16

17   Harol Lam Jordan
     Salinas Valley State Prison
18   Prisoner Id V-42322
     P.O. Box 1050
19   Soledad, CA 93960

20   Dated: September 17, 2010

21                                            Richard W. Wieking, Clerk
                                              By: LISA R CLARK, Deputy Clerk
22

23

24

25

26

27

28